1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9               FOR THE EASTERN DISTRICT OF CALIFORNIA

10  CURTIS DeFRANCE,

11            Petitioner,              No. 2:10-cv-0140 JFM (HC)

12       vs.

13  ANTHONY HEDGPETH, Warden,          ORDER AND

14            Respondent.              FINDINGS AND RECOMMENDATIONS

15  _____/

16            Petitioner, a state prisoner, proceeds pro se with a petition for a writ of habeas

17  corpus pursuant to 28 U.S.C. § 2254.  At issue are his 2007 convictions on charges of murder

18  during the commission of a robbery with use of a car as a deadly weapon, robbery, and taking

19  and driving a vehicle which was the personal property of another person.  For these offenses, the

20  trial court sentenced petitioner to life in prison without the possibility of parole.

21                              FACTS[1]

22            Stephan Elaine Brophy lived in a condominium owned by her
             mother.  Two of her adult children, Tristan and Kendrick Holliday,
23           lived with her.  The condominium had three bedrooms, but

24  _____

25       [1]  The facts are taken from the opinion of the California Court of Appeal for the Third
    Appellate District in *People v. Hedgpeth*, No. C055878 (Oct. 9, 2008), which appears in this
26  record and is hereinafter cited to as Lodged Document ("LD") 4.  Petitioner is the defendant
    referred to therein.

Kendrick usually slept in the living room. The bottom floor had a sliding glass door that opened to a patio. The patio was surrounded by a six-foot fence. A gate in the fence led to the parking lot.

The condo had two designated parking spaces, one of which was covered. Both Tristan and Kendrick had cars. Brophy did not own a car, but sometimes used Tristan's car; she did not use Kendrick's car. Kendrick usually parked in the shaded spot. At the time of the crime, Brophy was using Tristan's car and had parked in the shaded spot, which she preferred, so Kendrick parked in the second, or guest, spot.

Kendrick owned a Toyota Tercel. He bought the car for $2,400 in cash. His mother and grandparents helped him pay for it. The car had recently been stolen and vandalized. Minors had taken it for a joy ride and trashed it. The steering column had been damaged and Kendrick used a screwdriver to start the car. The locks were difficult to work so he did not lock it.

The car was registered in Kendrick's name. His mother was listed on the insurance "just in case," but she never drove it. She borrowed the car once or twice but was afraid to tell her son because the car was hard to drive and he would worry. Kendrick let his sister drive the car once when she was learning to drive a stick shift, but for the most part, only he drove it.

On the morning of July 10, 2005, Tristan was out of town visiting her father and Kendrick was asleep in the living room. Neighbors heard voices in the parking lot. They heard a woman yelling, "get out of that car," and then screeching tires.

When police arrived, Brophy was on her back in the center of the parking lot. A gelatin-like fluid was coming out of her right ear and there was a tire mark across her torso. There was a skid mark in the street.

That morning J.B. was leaving the Beverages and More Store on Sunrise Boulevard when he saw a light colored Tercel speed down the road and make an illegal U-turn. He had just picked up his daughter from a nearby hospital and she mentioned someone was brought in with a broken skull. He thought the speeder might be connected to that, so he contacted the police. J.B. identified defendant as the driver and had selected his picture from a lineup.

The Tercel was found shortly after noon in the North Highlands area. CSI processed the car and found defendant's palm print on the driver's window.

T.E., a convicted felon with a long criminal history, testified someone named Curtis came to the apartment where he was staying. Curtis said he was trying to steal some lady's car and he

2

1    ran over her because she tried to stop him.  T.E. was in jail facing a
     drug felony with two strikes.  The charge was reduced to a
2    misdemeanor.  The parties stipulated T.E. received no
     consideration for his statement or testimony.
3
4         Mark Super, a forensic pathologist, performed an autopsy on
     Brophy.  She was five-foot six-inches tall and weighed 264
5    pounds.  She had a large abrasion on the back of her head and a
     fractured skull.  She had subdural hematoma, bruising over her
6    body, and a fractured right ankle.  The cause of death was blunt
     force head, thoracic and right leg injuries.  The injuries were
7    consistent with being run over.  The most significant injury
     medically was to the head.
8
9         David Dowty, a member of the California Highway Patrol
     Multi-Disciplinary Accident Investigation Team and a certified
     expert in collision reconstruction, gave an opinion as to what
10   happened.  In his opinion, Brophy was behind the car when it
     backed up and hit her.  She fell to the ground, striking her head,
11   and the car ran over her.  Based on the skid marks, Dowty believed
     the car had accelerated rapidly.  The driver would have been able
12   to feel the impact.

13        In 2000, Officer Jason Warren stopped defendant when he was
     speeding.  The car he was driving was stolen.[2]  Defendant pleaded
14   guilty to vehicle theft.

15   LD 4 at 3-6.

16                                ANALYSIS

17   I.  Standards for a Writ of Habeas Corpus

18        Federal habeas corpus relief is not available for any claim decided on the merits in

19   state court proceedings unless the state court's adjudication of the claim:

20             (1) resulted in a decision that was contrary to, or involved an
               unreasonable application of, clearly established Federal law, as
21             determined by the Supreme Court of the United States; or

22             (2) resulted in a decision that was based on an unreasonable
               determination of the facts in light of the evidence presented in the
23             State court proceeding.

24   28 U.S.C. § 2254(d).

25   _____

26        [2]  The jury was given a limiting instruction before this testimony.  This evidence was
     admitted only to show intent.

                                       3

1    Under section 2254(d)(1), a state court decision is "contrary to" clearly

2  established United States Supreme Court precedents if it applies a rule that contradicts the

3  governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially

4  indistinguishable from a decision of the  Supreme Court and nevertheless arrives at different

5  result.  *Early v. Packer*, 537 U.S. 3, 7 (2002) (citing *Williams v. Taylor*, 529 U.S. 362, 405-406

6  (2000)).

7    Under the  "unreasonable application" clause of section 2254(d)(1), a federal

8  habeas court may grant the writ if the state court identifies the correct governing legal principle

9  from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the

10  prisoner's case.  *Williams*, 529 U.S. at 413.  A federal habeas court "may not issue the writ

11  simply because that court concludes in its independent judgment that the relevant state-court

12  decision applied clearly established federal law erroneously or incorrectly.  Rather, that

13  application must also be unreasonable."  *Id*. at 412; *see also Lockyer v. Andrade*, 538 U.S. 63, 75

14  (2003) (it is "not enough that a federal habeas court, in its independent review of the legal

15  question, is left with a 'firm conviction' that the state court was 'erroneous.'")

16    The court looks to the last reasoned state court decision as the basis for the state

17  court judgment.  *Avila v. Galaza*, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court

18  reaches a decision on the merits but provides no reasoning to support its conclusion, a federal

19  habeas court independently reviews the record to determine whether habeas corpus relief is

20  available under section 2254(d).  *Delgado v. Lewis*, 223 F.3d 976, 982 (9th Cir. 2000).

21  II.  Petitioner's Claims

22    A.  CALCRIM No. 521 and Adequacy of Record of Jury Instructions

23    Petitioner challenges the adequacy of the trial record as to the exact jury

24  instructions given.  He further claims the existence of a discrepancy as to whether the word

25  "AND" was omitted from CALCRIM No. 521 requires reversal.  The California Court of Appeal

26  set forth the applicable background to this claim:

4

After closing arguments, copies of the written jury instructions were distributed to the jurors. The court began to read the instructions. After a few instructions were read, the court stopped and called for a sidebar. After the unreported discussion, the court asked the parties to stipulate that the court reporter need not transcribe the instructions. The parties agreed and the remaining instructions were read off the record.

The clerk's transcript on appeal contains a set of written instructions labeled "Jury Instructions Given." These instructions begin with Judicial Council of California Criminal Jury Instructions (2006–2007) (CALCRIM) No. 200, on the duties of judge and jury, and continues through CALCRIM No. 3590, the final instruction on discharge of jury.

The record contains two versions of CALCRIM No. 521 on degrees of murder. The first version is titled: "521. People's Pinpoint—Murder: Degrees[.]" This instruction explains defendant is being prosecuted for first degree murder under two theories: willful, deliberate, and premeditated murder, and felony murder in the commission of a robbery. For murder during the commission of a robbery, the instruction provides: "To prove that the defendant is guilty of first degree murder under this theory, the People must prove; [¶] 1. That the defendant committed robbery; [¶] 2. That the defendant intended to commit robbery; [¶] AND[.]" At this point the instruction ends.

The next page is another version of CALCRIM No. 521. The heading on this instruction reads: "This instruction was drafted by the People. The defense objected to the title of 'People's Pinpoint' going to the jury, so the following heading was given to the jury in their packet. [¶] 521. Court's Instruction—Murder: Degrees[.]" The remainder of this instruction is the same as the previous page, except the word "AND" is missing. On page 197 is the remainder of the instruction, beginning with: "3. That while committing robbery, the defendant did an act that caused the death of another person."

As noted above, this set of jury instructions includes the final instruction to be given upon discharge of the jury, CALCRIM No. 3590, as well as an instruction to the alternate jurors. Presumably, these instructions were not given to the jury when they began deliberations.

On August 2, 2007, appellate counsel wrote the superior court asking to augment the record to include the packet of instructions actually provided to the jury. The court clerk declared the instructions in the file were the official set and the only saved set.

Appellate counsel then moved to settle the record, pointing out the problems, noted above, with the set of instructions in the clerk's

1    record.

2    The motion was granted. The trial court was ordered "to hold a
     hearing forthwith to provide a verbatim record of the oral
3    instructions provided to the jury and a reliable exact duplicate of
     the written instructions viewed by the jurors."
4
     The trial court held a hearing; present were the judge who presided
5    at trial, the court clerk, defense counsel David Muller, and Robert
     Gold from the district attorney's office. The assistant district
6    attorney who tried the case, Mark Curry, was not present; he had
     been appointed to a judgeship. Gold indicated he had
7    communicated with Curry about the instructions.

8    LD 4 at 6-9.

9    Following the hearing to settle the record, the trial court entered a minute order:

10        1.    There was a stipulation by the People and the Defense that
                the Court Reporter need not take a verbatim report of the
11              post-evidentiary instructions which were read to the jury.
                Instead the written form of the official instructions which
12              were to be read to the jurors and thereafter be entered into
                the record.
13
          2.    Pages 1CT 168 through 1 CT 214 were actually given to the
14              jurors during their deliberations with the following
                exceptions:
15
                i)     Except page 1CT 195 was not given to the jurors.
16                     This page begins with the header "People's
                       Pinpoint".
17
                ii)    The first two lines of 1 CT 196 were not given to
18                     the jurors.  That language was added by the court
                       clerk in effort to provide clarification about where
19                     the instruction came from.  The version that was
                       provided to the jurors began with the heading "521
20                     Court's Instruction Murder Degrees".

21                iii)   It cannot be settled as to whether the word "AND"
                       on pg. 1CT 195, appeared on 1CT 196 in the
22                     instructions given to the jurors at the end of pg. 196
                       or the beginning of pg. 197.
23
          3.    Pages 1CT 215, 216, 217 and 218 were not given to the
24              jurors during their deliberations.

25   LD 11 at 1.  Subsequently, the California Court of Appeal found that the sole and "actual dispute

26   as to what was in the jury instructions boils down to whether an "AND" was omitted from

1    CALCRIM No. 521."  LD 4 at 13.

2         Petitioner claims that the absence of a reliable record of the oral jury instructions

3    for appellate review deprived him of due process and that any waiver of the recording of the oral

4    instructions by counsel was invalid and constituted ineffective assistance of counsel.[3]

5         "The right of an accused in a criminal trial to due process is, in essence, the right

6    to a fair opportunity to defend against the State's accusations."  *Chambers v. Mississippi*, 410

7    U.S. 284, 294 (1973).  Where an appeal is an integral party of a state's system for adjudicating

8    guilt or innocence, the state's appellate procedures must comport with due process.  *Evitts v.*

9    *Lucey*, 469 U.S. 387, 393 (1985).  Due process does not necessarily require that a trial record

10    include a verbatim transcript of all proceedings.  *See generally*, *Griffin v. Illinois*, 351 U.S. 12,

11    18-20 (1956) (holding that where a transcript of the trial court proceedings is a prerequisite to

12    appeal, the State must either provide a transcript to indigent criminal appellants or utilize another

13    method that would assure an adequate and effective appeal); *Draper v. Washington*, 372 U.S.

14    487, 495 (1963) ("Alternative methods of reporting trial proceedings are permissible if they place

15    before the appellate court an equivalent report of the events at trial from which the appellant's

16    contentions arise."); *Mayer v. City of Chicago*, 404 U.S. 189, 194 (1971) ("A 'record of

17    sufficient completeness' does not translate automatically into a complete verbatim transcript.").

18         As to petitioner's claim of a due process violation based on an inadequate record

19    for appeal, the court of appeal held that "the better practice is to record all oral instructions given

20

21        [3] Both petitioner's opening brief and reply brief to the California Court of Appeal on

22    direct review of his criminal convictions are incorporated by reference into his federal petition. Therein, he also alleges that the failure to transcribe oral jury instructions violated state statutes

23    and various court rules.  To the extent petitioner intends to raise these alleged errors of state law here, no relief is available.  *See Windham v. Merkle*, 163 F.3d 1092, 1107 (9th Cir. 1998)

24    ("Habeas corpus relief is 'unavailable for alleged error in the interpretation of state law.'") (quoting *Middleton v. Cupp*, 768 F.2d 1083, 1085 (9th Cir. 1985).  The United States Supreme Court has "repeatedly held that a state court's interpretation of state law, including one

25    announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."  *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (citing *Estelle v. McGuire*, 502 U.S. 62,

26    67-68 (1991) and *Mullaney v. Wilbur*, 421 U.S. 684, 691 (1975).

1   to the jury" (LD 4 at 10), but nevertheless, the record regarding the written instructions given to

2   petitioner's jury was sufficient for meaningful appellate review of his jury instruction claim and

3   did not violate due process.  LD 4 at 6 & 11.  This conclusion is consistent with Supreme Court

4   precedent as set forth above (*see Draper*, 372 U.S. at 495; *Mayer*, 404 U.S. at 194) and is based

5   on a reasonable determination of the facts in light of the evidence presented in state court.

6            The court of appeal went on to hold, as to the discrepancy whether the word

7   "AND" was omitted from CALCRIM No. 521:

8            Assuming the "AND" was omitted, we find no prejudicial error.
         The portion of CALCRIM No. 521 addressing felony murder
9        where the murder is committed in the commission of a robbery
         provides: "To prove that the defendant is guilty of first degree
10       murder under this theory, the People must prove; [¶] 1. That the
         defendant committed robbery; [¶] 2. That the defendant intended to
11       commit robbery; [¶] AND [¶] 3. That while committing robbery,
         the defendant did an act that caused the death of another person."
12       Defendant suggests that if the "AND" was omitted, the jury may
         have believed the People had to prove only one element, rather
13       than all three. That is not plausible. Even without the "AND" the
         instruction reads as requiring all three elements.[FN3] Otherwise, the
14       jury could find first degree murder if it found only that defendant
         robbed or intended to commit robbery, even if no one was killed.
15       "'Jurors do not sit in solitary isolation booths parsing instructions
         for subtle shades of meaning in the same way that lawyers might.
16       Differences among them in interpretation of instructions may be
         thrashed out in the deliberative process, with commonsense
17       understanding of the instructions in the light of all that has taken
         place at the trial likely to prevail over technical hairsplitting.'
18       [Citation.]" (*People v. Williams* (1995) 40 Cal.App.4th 446, 457,
         46 Cal.Rptr.2d 730.)

19
                FN3. Any possible confusion as to this was cleared up by the
20              prosecutor's argument: "Bottom line is it's the same basic elements
                as felony murder. So if you conclude, yeah, he was engaged in a
21              robbery when he did this act, these are the three elements, basically
                the same, that he did an intentional robbery, that he did an act that
22              caused death, and the reason she died is because of the robbery.
                There's a connection between the robbery and the death."
23
         While we would prefer a reporter's transcript of the instructions
24       read to the jury, we find no prejudicial error in its absence. The
         record, as settled, indicates any error in the instructions was
25       harmless. The absence of a record of the oral instructions given did
         not deprive defendant of due process or the right to a fair trial.

26

1    LD 4 at 13-14.

2           A claim of instructional error does not raise a cognizable federal claim unless the

3    error, considered in context of all the instructions and the trial record as a whole, "so infected the

4    entire trial that the resulting conviction violates due process." *McGuire*, 502 U.S. at 71-72

5    (1991) (quoting *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *see also Henderson v. Kibbe,* 431

6    U.S. 145, 152-55, n.10 (1977).  In addition, on federal habeas corpus review, no relief can be

7    granted without a showing that the instructional error had a "substantial and injurious effect or

8    influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998)

9    (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

10          Assuming that the word "AND" was indeed omitted from CALCRIM No. 521, no

11   relief is available.  As the state appellate court determined, the plain language of the instruction

12   without the "AND" still required the jury to find all three elements of the offense.  Moreover, it

13   is simply not plausible that a rational jury might have believed the People only had to prove one

14   element of the challenged instruction, rather than all three.  Under these circumstances, petitioner

15   cannot establish the requisite prejudice for a due process violation based on an instructional

16   error.

17          Furthermore, with no showing of prejudice, the accompanying allegation that trial

18   counsel rendered ineffective assistance in stipulating that the oral instructions need not be

19   reported likewise fails.  *See Strickland v. Washington*, 466 U.S. 668, 687-90 (1984) (holding that

20   to demonstrate a denial of the Sixth Amendment right to the effective assistance of counsel, a

21   petitioner must establish that counsel's performance fell below an objective standard of

22   reasonableness and that prejudice resulted from the deficient performance).  For all these reasons,

23   no relief is available for petitioner's challenge to the jury instructions and the adequacy of the

24   record as to the oral instructions.

25          B.  Sufficency of Evidence of Robbery

26          Petitioner claims insufficient trial evidence supported his convictions on the

1   counts of robbery and murder during the commission of a robbery with use of a car as a deadly

2   weapon because the victim did not have actual or constructive possession of the stolen vehicle.

3   LD 1 at 48-60.

4           The Due Process Clause of the Fourteenth Amendment protects an accused

5   against conviction except upon proof beyond a reasonable doubt of every fact necessary to

6   constitute the crime with which he is charged.  *In re Winship*, 397 U.S. 358, 364 (1970).  On

7   habeas corpus review, sufficient evidence supports a conviction so long as, "after viewing the

8   evidence in the light most favorable to the prosecution, any rational trier of fact could have found

9   the essential elements of the crime beyond a reasonable doubt."  *Jackson v. Virginia*, 443 U.S.

10  307, 319 (1979); s*ee also Prantil v. California*, 843 F.2d 314, 316 (9th Cir. 1988) (per curiam).

11          The *Jackson* standard is applied "with explicit reference to the substantive

12  elements of the criminal offense as defined by state law."  *Davis v. Woodford*, 384 F.3d 628, 639

13  (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 319.)  The dispositive question is "whether the

14  record evidence could reasonably support a finding of guilt beyond a reasonable doubt."  *Chein v.*

15  *Shumsky*, 373 F.3d 978, 982 (9th Cir. 2004) (quoting *Jackson*, 443 U.S. at 318).  Under the

16  AEDPA, this standard is applied with an additional layer of deference.  *Juan H. v. Allen*, 408

17  F.3d 1262, 1274-75 (9th Cir. 2005).  This court must ask "whether the decision of the California

18  Court of Appeal reflected an 'unreasonable application of' *Jackson* and *Winship* to the facts of

19  this case."  *Id*. (citing 28 U.S.C. § 2254(d)(1)).

20          A court reviews the entire record when the sufficiency of the evidence is

21  challenged on habeas corpus.  *Adamson v. Ricketts*, 758 F.2d 441, 448 n.11 (9th Cir. 1985),

22  *vacated on other grounds*, 789 F.2d 722 (9th Cir. 1986) (en banc), *rev'd*, 483 U.S. 1 (1987).  It is

23  the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

24  reasonable inferences from basic facts to ultimate facts."  *Jackson*, 443 U.S. at 319.  If the trier of

25  fact could draw conflicting inferences from the evidence, the court in its review will assign the

26  inference that favors conviction.  *McMillan v. Gomez*, 19 F.3d 465, 469 (9th Cir. 1994).  The

1    inquiry of focus is not whether the evidence excludes every hypothesis except guilt, but rather,

2    whether the jury could reasonably arrive at its verdict.  *United States v. Mares*, 940 F.2d 455, 458

3    (9th Cir. 1991).

4              "Robbery is the felonious taking of personal property in the possession of another,

5    from his person or immediate presence, and against his will, accomplished by means of force or

6    fear." Cal. Penal Code § 211.  Constructive possession does not require an absolute right of

7    possession; "[f]or the purposes of robbery, it is enough that the person presently has some loose

8    custody over the property, is currently exercising dominion over it, or at least may be said to

9    represent or stand in the shoes of the true owner."  *People v. Hamilton*, 40 Cal.App.4th 1137,

10   1143 (1995).  In rejecting petitioner's claim of insufficient evidence on direct review, the

11   California Court of Appeal focused on state case law recognizing that constructive possession is

12   often found where the person has a special relationship with the owner of the property.  The state

13   court held:

14            Courts often recognize the necessary special relationship in robbery
              cases where business property is taken from the presence of an
15            agent or employee of the business. [String citation omitted.] Even a
              visitor in a store who was forced to remove and surrender money
16            from the store's cash box has been held to be a victim of the
              robbery. [Citation omitted.] [¶] By contrast, where property is
17            taken from one with no relationship to the owner of the property,
              such as a Good Samaritan, there is no robbery. [....]

18

19            Courts have also recognized the necessary special relationship for
              robbery in nonbusiness contexts. For example, in *People v. Bekele*
20            (1995) 33 Cal.App.4th 1457, 39 Cal.Rptr.2d 797 (disapproved of
              on other grounds by *People v. Rodriguez* (1999) 20 Cal.4th 1,
21            13–14, 82 Cal.Rptr.2d 413, 971 P.2d 618), a man saw the
              defendant burglarizing his pick-up truck and asked his coworker to
22            help him stop the theft. The coworker struck and chased the
              defendant, demanding he drop the property, until the defendant
23            threatened him with a gun. The court found that the circumstances
              were sufficient to support the defendant's conviction of robbery
24            from the coworker because the owner's request for help impliedly
              authorized the coworker to act in a representative capacity,
25            analogous to a security guard, in striking and chasing down the
              defendant. Thus, the coworker had constructive possession of the
              stolen property. (*Id.* at p. 1462, 39 Cal.Rptr.2d 797.)

26

A special relationship in a family context was found in *People v. Gordon* (1982) 136 Cal.App.3d 519, 186 Cal.Rptr. 373 (*Gordon* ). In the instant case, the trial court relied on *Gordon* in denying defendant's motion to dismiss. In *Gordon*, two armed robbers entered the home of Joseph and Mary Lopes, bound them and took $1,000, marijuana and a shoulder bag belonging to their adult son, who lived with them but was not at home at the time of the robbery. The court found the evidence that the Lopeses owned and lived in the residence sufficient to support the jury's findings that they possessed their son's property within the meaning of the robbery statute. It reasoned that the jury could properly conclude from such facts that the Lopeses were responsible for protecting personal property belonging to their son who lived in their home. (*Id.* at pp. 528–529, 186 Cal.Rptr. 373.)

Defendant contends the key to the holding in *Gordon* was that the goods were inside the parents' house. He argues *Gordon* is distinguishable because here the car was parked outside. A car, of course, is customarily outside the house; here it was parked in a space designated for the condominium. We disagree that the key to *Gordon* was the location of the property; rather, it was the relationship of the victims of the robbery to the owner of the property. The *Gordon* court found that if employees and janitors had constructive possession of their employer's property, "parents have at least the same responsibility to protect goods belonging to their son who resides with them in their home." (*Gordon, supra,* 136 Cal.App.3d at p. 529, 186 Cal.Rptr. 373.)

We find sufficient evidence to support finding Brophy a victim of robbery. As in *Gordon,* the owner of the property was her son who lived in her home. While the parents in *Gordon* denied knowledge of the marijuana that was stolen (*Gordon, supra,* at p. 529, 186 Cal.Rptr. 373), Brophy not only knew about the car, but had a connection to it. She had helped her son buy it, had access to the keys, had driven it, and was named on the insurance. The car was kept in one of the parking spaces designated for the condominium, close enough that she was able to respond when defendant tried to steal it. From these facts, the jury could conclude that Brophy had sufficient "loose custody" over the car to be a victim of robbery. (*People v. Hamilton, supra,* 40 Cal.App.4th at p. 1143, 47 Cal.Rptr.2d 343.)

LD 4 at 16-19 (footnote omitted).

Accepting, as this court must, the state court's interpretation and application of state law on constructive possession in the context of robbery (*Richey*, 546 U.S. at 76), sufficient trial evidence demonstrated that the victim had "loose custody" of the car when petitioner stole it such that the possession element of robbery was met.

1    In this regard, the car belonged to the victim's son and was parked in one of the

2 two stalls designated for the victim's condominium.  RT at 148, 151.  A neighbor heard a

3 woman's voice yell loudly "Get out of that car" and then heard car tires screeching.  RT at 164-

4 67, 169.  The victim had injuries consistent with having been knocked over backwards with the

5 rear of a car and then run over by a car. (RT at 136-37.)  On this record, the court of appeal's

6 determination that sufficient evidence supported petitioner's conviction on robbery and murder

7 during the commission of a robbery is a reasonable application of the standards of *Jackson* and

8 *Winship* to the facts of this case.  *See In re Winship*, 397 U.S. at 364; *Jackson*, 443 U.S. at 319.

9    C.  The Robbery Instruction

10    During proceedings outside the presence of the jury, the trial court met with both

11 counsel to discuss the jury instructions.  Defense counsel objected to the form and adequacy of

12 CALCRIM No. 1600, which instructs on the elements of robbery as follows:

13    To prove that the defendant is guilty of [robbery], the People must
     prove that:

14

15       1.    The defendant took property that is not his own;

16       2.    The property was taken from another person's
             possession and immediate presence;

17       3.    The property was taken against that person's will;

18       4.    The defendant used force or fear to take the property
             or to prevent the person from resisting;

19

20    AND

21       5.    When the defendant used force or fear to take the
             property, he intended to deprive the owner of it
             permanently or to remove it from the owner's

22             possession for so extended period of time that the
             owner would be deprived of a major portion of the

23             value or enjoyment of the property.

24 CT at 198.  CALCRIM No. 1600 further instructs on the element of possession, in relevant part:

25    Two or more people may possess something at the same time.

26       [And]

13

1          A person does have to actually hold or touch something to possess
2     it.  It is enough if the person has control over it or the right to
      control it, either personally or through another person.

3  CT at 198.

4          Petitioner's counsel explained the defense objection:

5          I don't believe that the robbery instruction is sufficient in this
6     regard because we live in a common law state where the force used
      has to be done against the owner of the property or someone that
      has control or authority over the property, not just any person.  And
7     I believe that the instruction is inadequate, so I'd be objecting.

8  RT at 261.  The trial court overruled the objection and gave the instruction as it appears above.

9          Petitioner contends the language of CALCRIM No. 1600 improperly related that

10  the victim of a robbery could be *any* other person, with or without the right to possess the object.

11  The California Court of Appeal disagreed with this claim on direct review, holding:

12          Defendant contends the instruction's shift from "another person" to
13     "any person," weakens its discussion of ownership. He objects that
       ownership is mentioned only with respect to the robber's specific
14     intent to deprive the owner. To the extent defendant is contending
       there is no robbery unless the victim owns the property, he is
       mistaken. "It is no defense to a charge of robbery (or of theft) that
15     the victim was not the true owner of the property taken." (*People v.
       Moore, supra,* 4 Cal.App.3d at p. 670, 84 Cal.Rptr. 771.) A special
16     relationship with the owner of the property, as here, is sufficient.
       (*Sykes v. Superior Court, supra,* 30 Cal.App.4th at p. 484, 35
17     Cal.Rptr.2d 571.)

18          Defendant contends the instruction failed to state that the People
19     must prove the victim of the robbery had the right to control the
       property. He is mistaken. The instruction states the People must
20     prove, "The property was taken from another person's possession
       and immediate presence." Possession is then defined as, "control
21     over [the property] or the right to control it, either personally or
       through another person."

22          Defendant contends the instruction is inadequate in explaining the
23     necessary "right to control." He complains the prosecutor argued
       the "right to control" in the broadest possible terms, focusing on
24     the fact that Brophy was Kendrick's mother. (AOB 65–66) To the
       extent he contends the prosecutor's argument was misconduct, he
       has forfeited the contention by failing to object below. The "failure
25     to object and request an admonition waives a misconduct claim on
       appeal unless an objection would have been futile or an admonition
26     ineffective." (*People v. Arias* (1996) 13 Cal.4th 92, 159, 51

14

1    Cal.Rptr.2d 770, 913 P.2d 980.)

2    Defendant contends the familial relationship of mother and son is
     insufficient to establish the right of control necessary for robbery.
3    He relies on cases indicating a family relationship does not
     establish control for purposes of agency in civil law. Missing from
4    his argument, however, is any authority that civil agency law sets
     the standard for robbery.
5
     As we have found above, the special relationship between Brophy
6    and Kendrick, that they were mother and son and lived together,
     coupled with the facts that the car was kept in a designated parking
7    space and Brophy helped pay for the car and was named on the
     insurance, was sufficient evidence to make her a victim of robbery.
8    Indeed, there was more evidence here of a special relationship than
     in *Gordon.* While the instruction could have provided more
9    assistance to the jury in finding she had control by specifying the
     factors the jury could consider, its failure to do so did not prejudice
10   defendant where the record does not show the jury had any
     difficulty in finding the car was taken from Brophy's "possession
11   and immediate presence" and the evidence supporting that
     determination was uncontradicted. On these facts, constructive
12   possession is established as a matter of law.

13   LD 4 at 21-23.

14        Thus, the challenged instruction accurately described state law, a determination is

15   not properly reviewed on federal habeas corpus. *See Richey*, 546 U.S. at 76. Moreover,

16   CALCRIM No. 1600 sufficiently explained the required element of possession such that the

17   instruction did not violate due process. Accordingly, the state court's rejection of this claim was

18   not contrary to, or an unreasonable application of clearly established Supreme Court precedent.

19   *See Estelle*, 502 U.S. at 71-72; *Kibbe,* 431 U.S. at 152-55.

20        D.    Reopening of Jury Selection

21        Petitioner claims the trial court erred in when it reopened jury selection and

22   allowed the prosecutor to exercise a peremptory challenge after both sides had accepted the jury.

23   The California Court of Appeal set forth the background to this claim as well as the relevant state

24   law on jury selection and peremptory challenges:

25        At one point in jury selection, during the exercise of peremptory
          challenges, both sides passed consecutively. The court indicated
26        they would return after lunch to select the alternates. The panel was

15

not sworn.

After lunch, before resuming jury selection, the parties met in chambers with Juror N. Juror N expressed concern about serving as a juror because he owned his own business and worked nights. He worked Monday through Thursday. He was concerned because he would have to be up 24 hours straight during the trial.

The defense attorney thought it was too much to ask of a juror and was concerned he would not be alert. The prosecutor thought Juror N would be okay, noting he did not raise the issue until the last minute. The court was uncomfortable asking Juror N to serve, particularly if something happened while he was driving. The court declared, "we keep going."

The prosecutor raised the issue of excusing two other jurors by stipulation. The parties had agreed to excuse Jurors B and M; they had been told and had left the courtroom.

In open court, Juror N was dismissed and jury selection continued. When the court asked if the panel was passed for cause, an unreported sidebar conference was held. The court indicated that except for the objection noted at sidebar, they would move to the challenge phase of jury selection. The court asked counsel to remind the court to put the discussion on the record. The prosecutor then excused Juror J, a juror who was part of the original panel. The defense requested another sidebar, which was held off record. Juror J was then excused. The defense exercised a challenge and then both sides passed. The court noted, "So we are back to choosing alternates." The jury panel was sworn and then the alternates were sworn.

The next day, during trial, defense counsel put on the record his objection to the People removing Juror J after Juror N expressed his concern about serving. Counsel believed the jury had been impaneled and removing Juror N did not give the People the right to start excusing other jurors.

The prosecutor stated for the record that the jury had not yet been sworn. "We were still in the jury selection process, and I feel that I properly used one of my peremptory challenges." The court agreed that after Juror N raised his concerns about serving, "the jury selection process was again thrown open for both counsel to exercise challenges to anyone in the box."

In this life-sentence case defendant was entitled to 20 peremptory challenges.  (Code Civ. Proc., §§225, subd. (B)(2); 231. A challenge to an individual juror must be made before the jury is sworn. (Code Civ. Proc., § 226, subd. (a).) The phrase "the jury is sworn" refers to the trial jury, not the alternates. (*People v. Cottle* (2006) 39 Cal.4th 246, 255, 46 Cal.Rptr.3d 86, 138 P.3d 230.) [....]

16

Peremptory challenges are taken or passed by each side alternatively, beginning with the People. (Code Civ. Proc., § 231, subd. (d).) "When each side passes consecutively, the jury shall then be sworn, unless the court, for good cause, shall otherwise order." (*Ibid.,* see also subd. (e).)

After the jury is impaneled and sworn, the court may call for additional jurors to serve as alternate jurors. (Code Civ. Proc., § 234; Pen.Code, § 1089.) An alternate juror may become a regular juror if, before the jury returns its verdict, a juror becomes sick or is otherwise unable to perform his duty. (Code Civ. Proc., § 233; Pen.Code, § 1089.)

[....]

... [O]nce both sides pass consecutively on peremptory challenges, even though the jury is not actually sworn, the right to exercise any remaining challenges is subject to the discretion of the trial court, based upon a showing of good cause to reopen jury selection. [*People v. Niles*, 233 Cal.App.3d at p. 320 & fn. 4.]

LD 4 at 23-26. Applying these facts and applicable state law, the California Court of Appeal

held that the trial court did not abuse its discretion in finding good cause to reopen jury selection.

LD 4 at 27.

The Sixth Amendment guarantees a right to a fair and impartial jury (*Duncan v. Louisiana*, 391 U.S. 145, 149 (1968)), applicable to criminal defendants in state court through application of the Fourteenth Amendment. *See Willams v. Florida*, 399 U.S. 78, 86 (1970); *Morgan v. Illinois*, 504 U.S. 719 (1992). Under clearly established Supreme Court precedent, a criminal defendant's Sixth Amendment right to a fair jury trial is violated if the "essential feature" of the jury is not preserved. *See Williams*, 399 U.S. at 100. As the Ninth Circuit has observed, however, "[n]either the number of peremptory challenges nor the manner of their exercise is constitutionally secured." *United States v. Turner*, 558 F.2d 535, 538 (9th Cir. 1977). Rather, a trial court is afforded "wide discretion" in setting the procedure for exercising peremptory challenges. *Id.*

Here, petitioner fails to allege how the state court's rejection of his jury selection claim contradicts or unreasonably applies Supreme Court precedent. He cites no federal

1  authority and advances no argument in support of his federal claim.  No relief is available for

2  petitioner's perceived error of state law based on the trial court's reopening of jury selection.  *See*

3  *Richey*, 546 U.S. at 76.

4        E.  Restitution Fine

5        Petitioner claims the trial court abused its discretion by imposing a $10,000

6  restitution fine.  This claim is not cognizable on federal habeas corpus.

7        "[A] federal court may issue a writ of habeas corpus to a state prisoner 'only on

8  the ground that he is in custody in violation of the Constitution or laws or treaties of the United

9  States.'"  *Swarthout v. Cooke*, 131 S.Ct. 859, 861 (2011) (quoting *Wilson v. Corcoran*, 131 S.Ct.

10  13, 15 (2010) (per curiam) (quoting § 2254(a)).  This language requires a nexus between the

11  petitioner's claim and the unlawful nature of the custody in order for subject matter jurisdiction

12  to exist.  *See Bailey v. Hill*, 599 F.3d 976, 980, 982 (9th Cir. 2010).  Imposition of a fine is not

13  "custody" and thus the "in custody" jurisdictional requirement of section 2254(a) is not met when

14  a state inmate makes an in-custody challenge solely to a restitution order.  *See Bailey v. Hill*, 599

15  F.3d 976, 980, 982 (9th Cir. 2010) (noting that a challenge to restitution lacks the nexus required

16  by the plain text of section 2254(a) to the petitioner's custody).

17        Here, of course, petitioner does not challenge solely his restitution fine; he makes

18  four other meritless claims, as were discussed and rejected herein.  In the context of 28 U.S.C. §

19  2255, the Ninth Circuit has held that collateral relief from a noncustodial punishment, such as a

20  fine or restitution order, is not made readily available to defendant just because he happens at that

21  time to also challenge custodial penalties:

22      [Petitioner] attempts to distinguish [*United States v.*] *Kramer* on
       the ground that Kramer *only* sought relief from restitution, while

23      [petitioner] also brought other claims in which he did, indeed, seek
       release from custody.  However, cognizable claims in a § 2255

24      motion do not run interference for non-cognizable claims.  Claims
       seeking release from custody can be brought under § 2255; claims

25      seeking other relief cannot.  To determine whether a given claim is
       cognizable under § 2255, we focus on the relief sought in the claim

26      itself, not on relief sought in other claims mentioned elsewhere in

18

1   the motion.  *Kramer*, 195 F.3d at 1130[.]

2   *United States v. Thiele*, 314 F.3d 399, 402 (9th Cir. 2002) (footnote omitted).  Section 2255 is

3   "the federal counterpart" to section 2254 and the two sections are "sufficiently analogous" (*see*

4   *Bailey*, 599 F.3d at 982) such that the reasoning and rule of *Thiele* that relief from restitution is

5   non-cognizable under section 2255 applies likewise to bar the same under section 2254.  *See*

6   *Bailey*, 599 F.3d at 982 (rejecting the petitioner's argument that textual differences between §§

7   2254(a) and 2255(a) compelled a different result on the issue of jurisdiction).  Accordingly,

8   petitioner's challenge to the amount of restitution imposed by the state court is not cognizable

9   here.

10                                 CONCLUSION

11          For all the foregoing reasons, petitioner's application for writ of habeas corpus

12   should be denied.  Pursuant to Rule 11 of the Rules Governing Section 2254 Cases in the United

13   States District Courts, "[t]he district court must issue or deny a certificate of appealability when

14   it enters a final order adverse to the applicant."  Rule 11, 28 U.S.C. foll. § 2254.  A certificate of

15   appealability may issue under 28 U.S.C. § 2253 "only if the applicant has made a substantial

16   showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The court must either

17   issue a certificate of appealability or must state the reasons why such a certificate should not

18   issue.  Fed. R. App. P. 22(b).  For the reasons set forth herein, petitioner has not made a

19   substantial showing of the denial of a constitutional right.  Accordingly, no certificate of

20   appealability should issue.

21          Accordingly, IT IS HEREBY ORDERED that the Clerk of the Court is directed to

22   assign this action to a United States District Judge; and

23          In accordance with the above, IT IS HEREBY RECOMMENDED that

24          1.  Petitioner's application for a writ of habeas corpus be denied; and

25          2.  The district court decline to issue a certificate of appealability.

26          These findings and recommendations are submitted to the United States District

                                        19

1  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen

2  days after being served with these findings and recommendations, any party may file written

3  objections with the court and serve a copy on all parties.  Such a document should be captioned

4  "Objections to Magistrate Judge's Findings and Recommendations."  Any response to the

5  objections shall be filed and served within fourteen days after service of the objections.  The

6  parties are advised that failure to file objections within the specified time may waive the right to

7  appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

8  DATED: May 3, 2012.

9

10                                UNITED STATES MAGISTRATE JUDGE

11

12  LS/defr0140.157

13

14

15

16

17

18

19

20

21

22

23

24

25

26